```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

MASSMUTUAL ASSET FINANCE LLC,

                    Plaintiff,              16 Civ. 1111

          -against-                         OPINION

ACBL RIVER OPERATIONS, LLC,

                    Defendant.

------------------------------------------X
```

A P P E A R A N C E S:

    <u>Attorneys for Plaintiff</u>

    BURKE & PARSONS
    100 Park Avenue, 30th Floor
    New York, NY 10017
    By:  William F. Dougherty, Esq.

    NUTTER, MCCLENNEN & FISH, LLP
    155 Seaport Boulevard
    Boston, MA 02210
    By:  Eric P. Magnuson, Esq.
        Susan K. Tvrdy, Esq.

    <u>Attorneys for Defendant</u>

    LATHAM & WATKINS LLP
    555 Eleventh Street, NW, Suite 1000
    Washington, DC 20004
    By:  Allen M. Gardner, Esq.
        Christopher J. Fawal, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/28/16

**Sweet, D.J.**

Defendant ACBL River Operations, LLC (the "Defendant" or "River Ops") has moved pursuant to Rule 12(b)(6) to dismiss the complaint of plaintiff MassMutual Asset Finance, LLC (the "Plaintiff" or "MassMutual"). Based on the conclusions set forth below, the motion is granted and the complaint is dismissed with prejudice.

Skilled and able counsel have presented the court with a carefully drafted significant agreement which both counsel assert is clear in its language and intent, and supported by the actions of the parties. However, the asserted clarity results in diametrically opposed conclusions. Such is the challenge of the judicial function.

**I.   Prior Proceedings**

In 2008, SunTrust Equipment Finance & Leasing Corp. ("SunTrust") and AEP MEMCO, LLC ("AEP MEMCO") entered into the Charter Agreement (the "Charter") and Charter Supplement No. 1 (the "Supplement"). Compl. ¶ 7. Under the Charter, SunTrust paid $8,805,983 to acquire 17 Rake Covered Hopper Barges (the "Barges") and SunTrust, as the Owner, agreed to bareboat charter

1

the Barges to AEP MEMCO, the Charterer. *Id.* ¶¶ 8-9; Charter, Docket Item ("D.I.") 1-1 at p. 1. AEP MEMCO, in turn, agreed to pay SunTrust quarterly rent payments totaling $156,414.51 during the Basic Term of the Charter: July 1, 2008 through June 30, 2027. *Id.* ¶ 9. There is no dispute about these terms or the making of these payments.

Section 13(e) of the Charter states that an Event of Default has occurred if "the Charterer [i.e., River Ops] shall be sold or transferred to, or merged into or consolidated with, any Person without the consent of the Owner [i.e., MassMutual] (not to be unreasonably withheld) (i) who is not an Affiliate, and (ii) whose senior unsecured debt is not rated Investment Grade after the consummation thereof." Compl. ¶ 13; Charter § 13(e). Events of Default give rise to the Owner's rights under Section 14 of the Charter. *Id.*

As of September 2014, MassMutual became the Owner under the Charter pursuant to an assignment agreement with SunTrust,[1] and, at some point prior to the filing of this action, River Ops became the new name for AEP MEMCO.[2] Compl. ¶ 6, 10.

---

[1] For ease of reference, MassMutual will be referred to as a party to the Charter, even at times before the transfer of rights from SunTrust to MassMutual.

[2] For ease of reference, River Ops will be referred to as the counterparty to the Charter, even at times before the name change. A

2

When the Charter and Supplement were executed, River Ops was owned by AEP Resources, which, in turn, was owned by American Electric, a publicly-traded utility. *Id.* ¶ 11. In November 2015, American Electric sold all of the stock of AEP Resources to Commercial Barge. *Id.* ¶ 12. As a result of the sale, Commercial Barge became the corporate grandparent of River Ops, while AEP Resources remained the corporate parent of River Ops. *Id.*

The parties do not dispute that MassMutual was not asked for its consent to the sale or transfer of AEP Resources stock. Nor is it in dispute that the senior unsecured debt of Commercial Barge, which was not an Affiliate of River Ops before the transfer, was not rated Investment Grade after consummation. *Id.* ¶ 13. The parties disagree, however, on whether the change in River Ops's corporate grandparent constitutes an Event of Default under Seciton 13(e). MassMutual contends that it does, and that it triggers MassMutual's rights under Section 14 of the Charter, including the right to receive payment of the Stipulated Casualty Value of the barges and to recover costs and attorneys' fees. *Id.* at ¶¶ 15, 16.

---

schematic of the iterations of the River Ops name is as follows: AEP MEMCO, AEP River Ops, ACBL River Ops.

MassMutual filed its complaint (the "Complaint") on February 12, 2016 seeking $8,055,547.26, as well as attorneys' fees, costs, and expenses of asserting a default under Sections 14(a)(5) and 14(b) of the Charter. Compl. ¶ 15. River Ops filed the motion to dismiss under 12(b)(6); the motion was argued and deemed fully submitted on September 15, 2016.

## II.  The Applicable Standards

*1. Standard of Review*

The Rule 12(b)(6) standard requires that a complaint plead sufficient facts to state a claim upon which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss under Fed. R. Civ. P 12(b)(6), all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (quotation marks omitted). A complaint must contain "sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) and *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); *see also Williams v. Calderoni*, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1, 2012). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S.

at 555 (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (3d ed. 2004)).

*2. Choice-of-Law*

Pursuant to Section 24(f) of the Charter, federal maritime law governs this dispute. The Charter's choice-of-law provision states: "This Charter Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and be governed by the maritime laws of the United States and, to the extent the foregoing are not applicable, the laws of the State of New York." Charter § 24(f).

In maritime cases, absent a relevant statute, courts apply "the general maritime law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986). The general maritime law consists of primarily federal case precedents, as decided by the Supreme Court and lower federal courts, and includes principles of ordinary contract law. *See id.* at 864-65 (describing maritime law as "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."); *see also* 29 JAMES WM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 707.05[1] (3d ed. 2016). Absent a relevant federal statute, courts look to "common-law principles of contract interpretation", including as embodied by state law.

6

*Critchlow v. First UNUM Lif. Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004); *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545-46 (1995) ("[E]xercise of federal admiralty jurisdiction does not result in automatic displacement of state law. . . . [F]ederal admiralty courts sometimes do apply state law.").

### 3. Principles Governing Contract Interpretation

A court's primary objective in interpreting a contract is to "give effect to the intent of the parties." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir.2000); *see also S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 125 (2d Cir. 2006). The parties' intent should generally be determined using the actual language of the contract and the circumstances surrounding the transaction. *See Compagnie Financiere*, 232 F.3d at 157. "[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal citation and quotation marks omitted)).

If the parties' intent is unambiguously conveyed by the plain meaning of the agreements, then "interpretation is a matter of law." *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (internal citation and quotation marks omitted). Where a contract is ambiguous, however, a fact issue exists precluding dismissal under Fed. R. Civ. P. 12(b)(6). *Bank of N.Y., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities."). Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy*, 773 F.3d at 114 (internal citation and quotations omitted).

### III. River Ops Was Not Sold or Transferred

The terms "sold" and "transferred" are not expressly defined in the contract. Thus, these terms should be given their "plain meaning." *See CBS Corp. v. Eaton Corp.*, No. 07 CIV. 11344 (LBS), 2009 WL 4756436, at *3 (S.D.N.Y. Dec. 7, 2009); *Samba*

8

*Enters., LLC v. Zango, Inc.*, No. 06 CIV. 8171 (DC), 2009 WL 736155, at *3 (S.D.N.Y. Mar. 20, 2009). To determine the plain and ordinary meaning of these terms, dictionary definitions prove useful. *See CBS Corp.*, 2009 WL 4756436, at *4; *Samba Enters.*, 2009 WL 736155, at *3; *In re Delta Air Lines, Inc.*, 381 B.R. 57, 64-65 (S.D.N.Y. 2008) ("A sound method for determining the plain meaning of words is to look at their dictionary definitions."); *Mazzola v. County of Suffolk*, 143 A.D.2d 734, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) ("[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.").

Section 13(e) provides that an Event of Default occurs under the Charter where "[t]he Charterer shall be sold or transferred to, or merged into or consolidated with, any Person without the consent of the Owner (not to be unreasonably withheld) (i) who is not an Affiliate, and (ii) whose senior unsecured debt is not rated Investment Grade after the consummation thereof." Charter § 13(e). According to MassMutual, the term "sold" is the past tense of the verb to sell, and sell means "to exchange or deliver for money or its equivalent . . . give up or surrender in exchange for price or reward." *Sell*, AMERICAN HERITAGE DICTIONARY (4th ed. 2006). Black's Law Dictionary

9

similarly defines "sale" as "[t]he transfer of property or title for a price." *Sale*, BLACK'S LAW DICTIONARY (10th ed. 2014).

The term "transferred" is the past tense of the verb "transfer." The verb "transfer" means: "1. To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of. 2. To sell or give." *Transfer*, vb., BLACK'S LAW DICTIONARY; *see also Transfer*, AMERICAN HERITAGE DICTIONARY ("To convey or cause to pass from one place person, or thing to another."). The noun form of "transfer" means "[a]ny mode of disposing of or party with an asset or an interest in an asset." *Transfer*, n., BLACK'S LAW DICTIONARY. MassMutual argues that the term "embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property." *Id.*

In the context of the Charter, according to MassMutual, River Ops has been "sold" because it has been exchanged, delivered, given up, or surrendered to another in exchange for consideration. Commercial Barge had no ownership interest in River Ops before the AEP Resources sale, but it does after the sale. Likewise, MassMutual argues that River Ops has been "transferred" because American Electric has disposed of its

10

interest in, and control over, River Ops by conveying it to Commercial Barge through the sale of AEP Resources. MassMutual also contends that American Electric recognized that River Ops was effectively being conveyed to Commercial Barge as evidenced by the fact that American Electric identified the Charter as a "material contract" in the sale of AEP Resources to Commercial Barge.

MassMutual also relies on Section 1.2 of the Charter Agreement to assert that Section 13(e) is triggered by a sale, transfer, merger, or consolidation of River Ops, whether affected "directly or indirectly." Even if Section 1.2's reference to "directly or indirectly" could be read into Section 13(e), it does not transform that anti-transfer provision into a change of control clause or make Section 13(e) applicable here.

MassMutual's contentions require reading into these terms that a sale of a corporate interest anywhere upstream from River Ops also constituted a sale of River Ops itself. In other words, they require reading "sale" and "transfer" to constitute a change of control of River Ops, though there is no relevant change of control provision here. MassMutual did not negotiate or draft Section 13(e), and the intent of the parties that did draft the Charter Agreement is best found in the words they

11

chose to use (and not use). The parties that negotiated Section 13(e) did not use any language that would require consent based on an upstream change of control. Courts routinely refuse to find a change of control provision in contracts that do not use the phrase "change of control." *See In re Integrated Res., Inc.*, No. 90-B-10411 (CB), 1990 WL 325414 (Bankr. S.D.N.Y. Oct. 22, 1990) (refusing to find a change of control provision where the parties did not specifically include one).

MassMutual does not support its position with cases where a court has interpreted a contract provision using the word "transfer" to encompass an upstream "change of control" without also specifically using standard change of control language. In both *H-B-S Partnership v. Aircoa Hospitality Services, Inc.*, 114 P.3d 306, 315 (N.M. Ct. App. 2005) and *Continental Cablevision v. United Broadcasting*, 873 F.2d 717, 719 (4th Cir. 1989), cited by MassMutual, the relevant contract provisions are interpreted to include change of control provisions because they explicitly reference a change in control.

Courts have rejected the "transfer" argument that MassMutual makes here. For example, in *Cellular Tel. Co. v. 210 E. 86th St. Corp.*, 44 A.D. 3d 77, 81 (N.Y. App. Div. 2007), the court confronted an anti-transfer provision that required

12

consent to "the transfer or other disposition" of more than 25% of the stock of the tenant-subsidiary. The court in Cellular rejected an argument premised on precisely the same reasoning Plaintiff offers here, finding that the "stock was not transferred [by the sale of corporate parents], except in the broadest sense." *Id.* at 82. The *Cellular* court rejected an overbroad definition of "transfer" that would completely transform commonplace anti-transfer provisions into broad change of control provisions. *Id.*; see also, *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 430 (S.D.N.Y. 2010) (rejecting argument that transfer of an interest in joint venture's parent companies was the same as a transfer of interest in the joint venture itself).

MassMutual's proposed definition of "transfer" would encompass the sale or transfer of publicly held stock in American Electric, River Ops' former grandparent, which is a publicly traded company. Opp. at 2. Under Plaintiff's proposed interpretation, every American Electric stock sale would constitute a "transfer" of ownership of River Ops that would trigger Section 13(e).

In part to avoid this result, it is well-established that a corporate parent and subsidiary "possess[] a separate

13

existence and [are to be] treated separately from" one another. *Engel v. Teleprompter Corp.*, 703 F.2d 127, 134 (5th Cir. 1983) (finding that changes in ownership, in form, or in control of a parent corporation do not constitute a change in ownership or control of the assets and liabilities of a subsidiary). Similarly, "[a] corporate parent which owns the shares of a subsidiary does not . . . own or have legal title to the assets of the subsidiary." *JPMorgan Chase Bank, N.A. v. Malarkey*, 65 A.D.3d 718, 721 (N.Y. App. Div. 2009) (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)); *Wallert v. Atlan*, No. 14 CIV. 4099 PAE, 2015 WL 518563 (S.D.N.Y. Feb. 5, 2015) (rejecting the argument that parent corporation owned subsidiary's copyright rights). A contract with a subsidiary does not constitute a contract with the subsidiary's parent. *Hudson Optical Corp. v. Cabot Safety Corp.*, 162 F.3d 1148 (2d Cir. 1998) (finding that parent corporation "had no standing to assert [subsidiary's] legal rights").

MassMutual further argues that Section 13(e) is triggered regardless of who the actor is and, therefore, regardless of whether River Ops is directly involved in the transaction. Because Section 13(e) uses the passive voice, MassMutual contends, the actor involved in the transactions contemplated by Section 13(e) is irrelevant and that the use of

14

passive voice also somehow increases the reach of 13(e) to all upstream transactions. Opp. at 10. To make that argument, Plaintiff focuses on the portion of Section 13(e) that references whether River Ops is sold or transferred to "any Person." Section 13(e) does not require a certain actor; however, it is defined by the object rather than the subject. Therefore, Section 13(e) covers only transactions in which River Ops is "sold or transferred to, or merged into or consolidated with" some (non-Affiliate) Person. Again, if nothing happens to River Ops then Section 13(e) does not reach the transaction.

The use of the phrase "merged into or consolidated with" is meaningful here. The "merged into or consolidated with" phrase only makes sense if a transaction specifically involves River Ops. MassMutual's interpretation of Section 13(e) requires an arbitrary distinction be made between the interpretation of "sold or transferred to" and the interpretation of "merged into or consolidated with" even though those terms appear one right after the other in the same sentence. *La Salle Bank Nat. Ass'n v. CIBC Inc.*, No. 08 CIV. 8426 WHP, 2011 WL 4943341, at *4 (S.D.N.Y. Oct. 17, 2011) (courts construe contract terms in accordance with the meaning of the words that are associated with them). Section 13(e) provides that the contemplated sale,

15

transfer, merger, or consolidation necessarily must involve River Ops.

MassMutual also contends that the Charter Agreement must provide for an Event of Default if River Ops is cut off from its publicly traded corporate grandparent, American Electric. *See* Opp. at 13 (arguing that tying River Ops to American Electric was "the parties' facially obvious reason for drafting Section 13(e)"). MassMutual suggests that the contractually-defined term "Affiliate" must always include a corporate link to American Electric because Plaintiff posits that such a link must have been in the minds of the original parties who negotiated the Charter Agreement. Opp. at 13-14. However, the parties to the Charter Agreement did not define "Affiliate" to require control by American Electric, though they could have, just as they could have included an explicit change of control provision pertaining to the "sale" and "transfer" language.

MassMutual's final argument is that Section 13(e) is a change of control because the Charter Agreement was listed as one of many contracts for which consent "may be required" in an entirely separate agreement. See Opp. at 19. However, over-disclosure via transaction schedules is a commonly employed

16

tactic used by seller's counsel to try to shift risk from seller to buyer. Christopher S. Harrison, MAKE THE DEAL: NEGOTIATING MERGERS AND ACQUISITIONS, 110 (2016). As noted in the preface of the Schedules, however, "[n]o disclosure in the Schedules shall be an admission or indication . . . that the information disclosed is required by the terms of the Agreement to be disclosed." *See* Magnuson Decl., Ex. 1 at p.1. Over-disclosure by seller's counsel in the schedule of contracts that "may" require consent does not change the actual words or meaning of 13(e) as concluded above.

**Conclusion**

Based upon the conclusions set forth above, the Defendant's motion is granted, and the Complaint is dismissed with prejudice.

New York, NY
November 28 2016

ROBERT W. SWEET
U.S.D.J.